## In re CREDIT ACCEPTANCE CORPORATION SECURITIES LITIGATION.

### No. 98–70417.

United States District Court,
E.D. Michigan,
Southern Division.

April 23, 1999.

Gerald Mantese, Troy, Starley Bernstein, NY, for Plaintiffs.

Andrew McGinness, Ann Arbor, Timothy Nelson, Chicago, IL, for Defendants.

## OPINION & ORDER STRIKING AFFIDAVIT AND GRANTING DEFENDANTS' MOTION TO DISMISS

EDMUNDS, District Judge.

This matter comes before the Court on Defendants' motion to dismiss and Defendants' motion to strike the affidavit of Michele M. Stanton. As discussed below, the Complaint is insufficient to state a claim for securities fraud under the heightened pleading standard applicable in this area of law because it fails to adequately allege scienter. Therefore, the motion to dismiss is GRANTED. Likewise, the motion to strike the affidavit is GRANTED.

1. Although Plaintiffs have pled this suit as a class action, the Court has not certified it as

## I. The Counts and the Parties

### A. Complaint Alleges Two Counts

In this consolidated class action lawsuit,[1] the shareholder Plaintiffs allege that the Defendants, Credit Acceptance Corporation ("CAC"), and three of its individual officers, Messrs. Donald Foss, Richard Beckman, and Brett Roberts, engaged in securities fraud. Specifically, Plaintiffs' consolidated complaint alleges two Counts: (1) a violation of Section 10(b) of the Securities Exchange Act of 1934, ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; and (2) a violation of Section 20 of the Exchange Act, 15 U.S.C. § 78t(a), for "controlling person" liability on the part of Foss, Beckman and Roberts.

### B. The Parties

The Defendant Corporation, CAC, is a financial services company that generates revenue by providing sub-prime, high-risk, 'D' grade loans to used car purchasers through car dealers. Specifically, CAC finances consumer used car purchases by accepting assignments of installment contracts entered into by the purchaser and the car dealer. The installment contract represents the amount financed, i.e., the purchase price of the car less any down payment received by the dealer from the customer.

Under its agreement with car dealers, CAC gets 20% of the payments received on an installment contract as its servicing fee, and the dealer is entitled to the remaining 80%. At the time it accepts a contract from a dealer, CAC advances the dealer a percentage of the amount the dealer is entitled to receive in the event that the consumer makes all the payments. The percentage advanced is allegedly dependent on several factors including the dealer rating, the percentage of the down payment to the total purchase price, the

such.

customer's credit rating, the car's value, and the value of add-on products, such as insurance.

When CAC accepts assignment of a contract, it records: (1) the gross amount of the installment contract as an installment contract receivable; (2) CAC's servicing fee as an unearned finance charge; and (3) the remainder of the amount due under the contract as a dealer holdback. If the contract meets the criteria for an advance, the dealer is advanced a portion of the amount due it, which is netted against the dealer holdback. (Defendants' App. Exb. A at 19).

In order to provide for potential losses resulting from installment contracts that are uncollectible, CAC maintains a reserve for future credit losses. If CAC cannot collect the entire amount of a contract, the uncollected balance is charged off against dealer holdbacks, unearned finance charges, and the allowance for credit losses. CAC also keeps a reserve for losses on dealer advances that may not be recovered. Dealer advance balances are reviewed monthly and those deemed to be uncollectible are charged against the reserve. (Complaint at ¶ 52). CAC's 10–k and 10–Q statements from June 1995 until June 1997 all warned, "Ultimate losses may vary from current estimates and the amount of the provision, which is a current expense, may be either greater or less than actual charge offs." (Complaint at ¶ 52).

The Plaintiffs owned, acquired, or purchased stock in CAC during the time period of August 14, 1995 through October 22, 1997, the designated "class period." They represent themselves and all others similarly situated.

## II. A Summary of the Complaint's Allegations

### A. Actions by Credit Acceptance Corporation

The precipitating event that led to the filing of this lawsuit occurred on October 22, 1997 when CAC issued a press release announcing a loss for the third quarter of 1997. This loss resulted from a decision by CAC management to increase its reserve for credit losses. CAC had recently installed new software that it claims allowed it to more accurately assess the credit risks it was undertaking by financing used cars. As a result of the new computer program, CAC determined that it must increase its credit loss reserves. Following an adjustment which added $60 million to the credit loss reserve pool, CAC's stock plummeted from $9.75 per share to $6.00 a share on October 23, 1997. (Complaint at ¶¶ 89–90). Prior to this drop, CAC had experienced five successive years of increases in quarterly earnings. (Complaint at ¶ 31).

The Plaintiffs' complaint alleges that Defendants knew its loan loss reserves were inadequate and that CAC's stock was fraudulently overvalued. Plaintiffs allege CAC deceived its shareholders in the following ways:

(1) CAC was positioning itself in such a way as to unreasonably risk not being able to recoup its large capital outlays to its dealer network;

(2) CAC was improperly refunding and thereby negating its highly touted, purportedly "non-refundable" new dealer enrollment fees, which fees were held out as a significant revenue generator for CAC as a quality check on its dealer base;

(3) CAC was improperly exaggerating the true value of its collateral in the financed cars by its use of invalid valuation methods, thereby grossly overstating the level of its security interest in those cars; and

(4) CAC overall, was failing to maintain and follow consistent underwriting criteria.

(Plaintiffs' Brief at 4).

Plaintiffs contend that as a result of these activities, discussed more fully below, CAC misrepresented that it had a stable business model, and overstated its financial results by grossly understating

its reserves for credit losses. (Complaint at ¶ 6).

### 1. Improper Refunds of Dealer Enrollment Fees

The first source of alleged fraud involves CAC's dealer enrollment fees. Plaintiffs allege that the dealer enrollment fees were actually fictitious revenues because those amounts were paid back to dealers in the form of advances. When a dealer enrolls with CAC, it is required to pay an enrollment fee of $4,500. According to CAC, this fee was charged to create a barrier to entry for CAC competitors because a dealership that pays the enrollment fee will be less likely to enroll with a CAC competitor. The fee also discourages "fly-by-night" dealers from joining, and covers administrative costs.

Plaintiffs contend the fees were not actually revenue, as accounted for, because the fees were paid back in the form of dealer advances. Plaintiffs allege CAC failed to disclose that new dealers received as much as $5,000 in advance checks in excess of underwriting procedures. (Complaint at ¶¶ 61–62). "By instituting this pay-back scheme, [CAC] substantially increased its risk on its advance pool because the Company was advancing $5,000 more in advances to each new dealer than its 'normal' underwriting standards would permit. The extraordinary advances, at a minimum, should have been expensed and treated as a deposit." (Complaint at ¶ 62). Plaintiffs claim CAC's failure to disclose the pay-back scheme improperly inflated revenues and misled the investing public regarding the amount of risk CAC undertook.

### 2. Overvalued Used Cars

Next, Plaintiffs contend that the value of the cars that CAC assisted in financing were grossly overvalued. One of the ways in which CAC justified low loan loss reserves and allayed fears concerning uncollectible D grade loans was by allegedly placing a high value on the security interest that CAC obtained in the vehicle as a result of the sale. Plaintiffs contend that in reality the cars were overvalued because the dealers intentionally disregarded and misused Kelley Bluebook value estimation standards. Plaintiffs allege CAC allowed dealers to (1) value "junk cars" in need of significant repairs as if they have already been reconditioned; (2) fail to deduct value for excessive mileage; (3) add amounts for worthless vehicle add-ons; (4) use Kelley Bluebook valuation methods for cars, failing to account for the harsh effects that Midwest weather has on them; (5) value cars based upon Kelley Bluebook valuation methods which are 28–45% higher than the NADA Guide even when the appropriate weather conditions are taken into account. (Complaint at ¶¶ 67–72).

### 3. Alleged Violations of Underwriting Standards

Further, Plaintiffs allege CAC engaged in risky and inconsistent underwriting practices. (Complaint at ¶ 73). CAC allegedly increased the amount advanced to the dealers on cars, although CAC knew the cars were of substandard collateral value and that the customers had a high risk of default. The Complaint alleges, "Initially, CAC based its advance amount on the lesser of two formulas—either 150% times the new down payment or 50% of the unpaid balance." At an unspecified time, however, CAC allegedly changed these percentages to 195% and 65% respectively. By December of 1995, CAC utilized an entirely new computation: "50% of the amount financed but no greater than 50% of the Kelley Blue Book retail value to the vehicle." (Complaint at ¶ 73).

### 4. Violations of GAAP

Plaintiffs contend that Defendants violated Generally Accepted Accounting Principles ("GAAP"), specifically, Financial Accounting Statement No. 5, which requires that all estimated losses be accrued and reported against current income. (Complaint ¶ 51). Plaintiffs allege that by understating the adequacy of its loan loss reserves, CAC materially overstated its earnings and net income. More specifically, Plaintiffs allege that the 10–Qs and 10–

Ks filed between June 1995 and June 1997 violated the following GAAP principles:

(1) The principle that the financial information presented should be complete; the substance rather then the form of a transaction should be reflected; items included in the financial statement be reliable corroborated by outside evidence (verifiability); and the financial statement should contain and disclose relevant, understandable, and timely information for the economic decisions of the user was violated (FASB Statement of Concepts No. 2);

(2) The principle that the financial statement provide reliable financial information about the enterprise for the economic decisions of the use was violated (FASB Statement of Concepts No., 1 and No. 2);

(3) The principle that estimated losses should be accrued was violated (FASB Statement No. 5);

(4) The repossessed collateral was not valued in accordance with FASB 15 and the AICPA Finance Company Accounting and Audit Guide, and;

(5) The principles governing interim reporting was violated (Accounting Principles Board Opinion No. 28).

(Complaint at ¶ 56).

Plaintiffs alleged these violations resulted in materially false and misleading financial statements.

## B. Defendants' Knowledge of the Fraud

The Plaintiffs also allege, as they must, that Defendants acted with scienter. Plaintiffs base their allegations concerning Defendants knowledge of the fraud on the following: (1) the magnitude of the adjustment that Defendants made to the loan loss reserves; (2) related litigation; (3) motive and opportunity; and (4) the GAAP violations. While the Complaint alleges some knowledge on the part of Foss and Beckman, it does not allege any scienter on the part of Roberts.

### 1. The Akron Litigation

Individual Defendant Foss owned and controlled Larry Lee's Auto during the time period in question. Larry Lee's did business with CAC. The Complaint alleges that Larry Luedeman, a/k/a Larry Lee, testified in a series of cases filed in Akron, Ohio ("Akron Litigation") that Defendant Foss personally participated in the management of Larry Lee's and that he personally approved and encouraged Larry Lee's to market and sell overvalued used cars. (Complaint at ¶¶ 102–04). Further, there is evidence from the Akron Litigation that Larry Lee's had a reputation for overvaluing used cars that were not truly reconditioned. (Complaint at ¶ 105). Also in the Akron Litigation, according to the testimony of Michael Knoblaugh, the vice president of collection at CAC, "the most common excuse for a customer missing their first payment to CAC was 'the car broke down.'" (Complaint at ¶ 106). Knoblaugh also mentioned that other factors contributed to the probability of default, including cars that did not last for the term of the contract, and instances where the car was sold over the standard guidebook price. (Complaint at ¶ 106). From this, Plaintiffs contend Defendant Foss had knowledge of the fraudulent scheme.

### 2. Motive and Opportunity

The Plaintiffs also allege that Defendants Foss and Beckman had strong motives and opportunities to commit fraud. They each had a strong incentive to issue false and misleading financial statements because they benefitted personally from the stock's overvaluation. The Complaint alleges that both Foss and Beckman profited from their fraud because each sold CAC stock during the Class Period. Foss sold 2,425,000 shares resulting in proceeds of nearly $60 million. Likewise Beckman sold 80,000 shares resulting in proceeds of nearly $2 million. (Complaint at ¶¶ 112–13). Further, CAC itself sold $70 million of Senior Notes at more favorable interest rates allegedly due to Defendants' fraud.

(Complaint at ¶ 114). Also, Plaintiffs allege Defendants fraud allowed CAC to more than double its financial line of credit. (Complaint at ¶ 115).

### 3. GAAP Violations Allegedly Indicate Conscious/Reckless Misbehavior

Lastly, Plaintiffs allege that the violations of GAAP, *see supra* Part II.A.4, are evidence of conscious or reckless misbehavior on the part of the Defendants. (Complaint ¶ 116). Plaintiffs contend that Beckman and Foss, because of their high-level, executive positions with the company, were "fully aware of or consciously disregarded the risks of [CAC] inadequately setting its loan loss reserves." (Complaint at ¶ 116.) Plaintiffs claim that the "frequency and magnitude of Defendants' false and misleading statements is strong evidence that Defendants acted with knowledge of the falsity of their statements or, at a minimum, with a conscious disregard for their falsity." (Complaint at ¶ 117).

## III. Standard for Motion to Dismiss

### A. Fed.R.Civ.Pro. 12(b)(6)

In considering a motion to dismiss pursuant to Fed.R.Civ.Pro. 12(b)(6) this Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *In re DeLorean Motor Company*, 991 F.2d 1236, 1240 (6th Cir.1993). The complaint must include direct or indirect allegations "respecting all the material elements to sustain a recovery under *some* viable legal theory." *Id.* (citations omitted).

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. *Elliot Co., Inc. v. Caribbean Utilities Co., Ltd.*, 513 F.2d 1176, 1182 (6th Cir.1975). In a light most favorable to plaintiff, assuming all allegations are true, the court must determine whether the complaint states a

valid claim for relief. A motion to dismiss a complaint for failure to state a claim should not be granted "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citations omitted).

### B. Materials to be Considered: Motion to Strike Affidavit Is Granted

■ Unless a court converts a motion to dismiss into a motion for summary judgment, a court may not consider material that exceeds the scope of the complaint. "Matters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." *Weiner v. Klais & Co.*, 108 F.3d 86, 88–89 (6th Cir.1997)(citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir.1989)). In a securities fraud case, however, the Sixth Circuit has instructed that district courts may consider the full text of SEC filings, prospectus, analysts' reports, and statements integral to the complaint, even if not attached to the complaint without converting a motion to dismiss into a motion for summary judgment. *In re Royal Appliances Sec. Litig.*, 1995 WL 490131 *2 (6th Cir.Aug. 15, 1995).

■ Further, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claim." *Weiner*, 108 F.3d. at 89; *see also, Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017–18 (5th Cir.1996)(courts must limit inquiry to facts stated in complaint and documents either attached to or incorporated in complaint; however, courts may also consider matters of which they may take judicial notice).[2]

■ Attached to their response to CAC's motion to dismiss, Plaintiffs have submitted the affidavit of Michele M.

---

**2.** Based on these cases, the Court will not consider the transcript of the ABC $^{20}\!/_{20}$ News Report which Plaintiffs recently filed in a supplemental submission. *See* Plaintiffs' Submission of Additional Supplemental Authority, Exb. 4.

Stanton, an accountant who attests to the inefficacy of the Defendants' accounting methods. The Court will not consider the affidavit for the purposes of this motion. First, the Plaintiffs do not refer to the affidavit in their Complaint. Plaintiffs contend that, "[The affidavit] is merely presented to the Court to clarify some of the accounting issues that permeate the Complaint and to rebut Defendants' contentions that the Complaint's accounting allegations are conclusory." (Plaintiff's Memorandum in Opposition to Defendants' Motion to Strike Affidavit at pg. 2) The Plaintiffs then offer to incorporate the affidavit by reference in their complaint but state, "Plaintiffs believe that this may be procedurally unnecessary given the extensive allegations contained in their Complaint." Plaintiffs seem to be saying that the Complaint is sufficient without the affidavit. Assuming that is true, it seems (1) unnecessary for the Court to require the Plaintiffs to incorporate it by reference and (2) futile for the Court to consider it in any event.

Furthermore, in the context of securities litigation, motions to dismiss serve the special function of weeding out insufficient complaints before the discovery process commences. Converting this motion into a motion for summary judgment would undermine the provisions of Congress's Private Securities Litigation Reform Act, discussed *infra*. That Act sought to curtail the filing of frivolous lawsuits, and to that end, contains a section requiring an automatic stay of discovery during the pendency of a motion to dismiss. 15 U.S.C.

§ 78u–4(b)(3)(B). Conversion of this motion into one for summary judgment would not be prudent in this context. Therefore the affidavit is STRICKEN.

## IV. Analysis

Defendants have filed this motion to dismiss, alleging that Plaintiffs' Complaint fails to state a claim upon which relief can be granted. Defendants argue that Plaintiffs' complaint is deficient because it does not meet the heightened pleading standards under the Private Securities Litigation Reform Act (PSLRA), Specifically, they contend that it (1) fails to plead fraud with particularity; and it (2) fails to allege facts giving rise to a strong inference that the Defendants acted with conscious intent to defraud. Before the Court can test the sufficiency of the complaint, the Court must first settle an imperative preliminary dispute between the parties: how and to what extent Congress' recent enactment of the PSLRA changed the pleading standards in the context of securities litigation.

### A. Elements of Section 10(b) Violation

■ In order to state a claim for securities fraud under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) [3] and Rule 10b–5 [4] promulgated thereunder, a plaintiff must allege each of the following elements related to the sale of securities: (1) a misrepresentation or omission; (2) of a material fact; (3) made with scienter; (4) on which plaintiff reasonably relied; and (5) which proximately caused plaintiff's in-

---

**3.** Section 10(b), 15 U.S.C. § 78j(b) provides,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of . . . any national securities exchange— . . . (b) to employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**4.** Rule 10b–5 of the Commission, 17 C.F.R. 240.10b–5, provides:

It shall be unlawful for any person . . . (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact necessary or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, no misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

jury. *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir.1991); *Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485 (6th Cir.1990). Scienter refers to a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

## B. Pleading Standard

### 1. Pleading Fraud: Fed.R.Civ.Pro. 9

■ When a plaintiff alleges that a defendant has engaged in fraudulent activity, Fed.R.Civ.Pro. 9(b) requires that the plaintiff plead its allegations of fraud with particularity. The Rule requires that, "[i]n all averments of fraud or intent, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.Pro. 9(b). The Sixth Circuit has instructed that the pleading requirement is satisfied when the complaint

> specifies the parties and the participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the time, place and content of the representations, the fraudulent scheme, the fraudulent intent of the defendants, reliance on the fraud, and the injury resulting from the fraud.

*Michaels Building Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir.1988).

■ The purpose of Rule 9 is three-fold: (1) it provides defendants with fair notice of the claims against them; (2) it protects defendants from harm to their reputations or goodwill caused by unfounded fraud allegations; and (3) it reduces the number of strike suits and discourages fishing expeditions. *Picard Chemical, Inc. v. Perrigo Co.*, 940 F.Supp. 1101, 1114 (W.D.Mich. 1996).

■ Congress was not satisfied that Rule 9 was sufficient to curb abuse of the securities laws by private litigants because "the courts of appeals ha[d] interpreted Rule 9(b)'s requirements in conflicting ways, creating distinctly different standards among the circuits." Joint Explanatory Statement of the Committee of Conference, Statement of Managers, H.R. Conf. Rep. No. 104–369, 104th Cong. 1st Sess. at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730–48 ("Conference Committee Report" or "Conference Report"). Therefore, Congress passed the Private Securities Litigation Reform Act in an attempt to clarify the pleading requirements for fraud.

### 2. Private Securities Litigation Reform Act (PSLRA)

#### a. Fraud

In 1995, Congress enacted the Private Securities Litigation Reform Act (PSLRA), Pub.L. No. 104–67, 15 U.S.C. § 78u–4(b)(1) & (2), which sets pleading requirements for securities fraud actions. Section 78u–4(b)(1) provides that in a securities action where the plaintiff claims the defendant made misleading statements of fact, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

■ Following the passage of the PSLRA, in *Havenick v. Network Express, Inc.*, 981 F.Supp. 480 (E.D.Mich.1997), Judge Rosen articulated the pleading standard for fraud under the new Act. To adequately allege fraud, the Complaint must identify: "(1) the parties and the participants in the alleged fraud; (2) the time, place, and content of the representations; (3) each statement alleged to have been misleading; (4) the reason or reasons why the statement is misleading; (5) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed; (6) the fraudulent scheme; (7) the fraudulent intent of the defendants; (8) reliance on the fraud; and (9) the injury resulting

from the fraud." *Havenick*, 981 F.Supp. at 524, (citing *Michaels Building Co.*, 848 F.2d 674, 679 (6th Cir.1988) and 15 U.S.C. § 78u–4(b)(1)).

### b. Scienter

The PSLRA also sets pleading requirements for private securities actions in which the plaintiff alleges that the defendant acted with a particular state of mind. In these circumstances, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Complaints that fail to meet both pleading requirements must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A).

The question becomes what the PSLRA standard actually requires in order for a plaintiff to sufficiently plead scienter. The parties debate this issue at length. In summary, Plaintiffs contend that the appropriate standard is the Second Circuit standard which was developed prior to the passage of the Act. The Second Circuit standard required a plaintiff to plead with particularity facts giving rise to a strong inference of fraudulent intent, by (1) showing a motive and opportunity for committing fraud or (2) demonstrating circumstantial evidence of either reckless or conscious behavior. *See In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 268–69 (2d Cir.1993). In contrast, Defendants argue that the Act did not codify the Second Circuit standard, but proscribed a stricter standard requiring plaintiffs to plead with particularity facts giving rise to a strong inference that the defendants acted with fraudulent intent, i.e., conscious recklessness or knowing misrepresentation.

#### i. Courts are split on the issue

##### A. Conscious recklessness or actual intent

The Courts that have previously considered this issue are sharply divided on the issue of what pleading standard applies in the wake of the PSLRA. For example, a number of courts have held that the PSLRA adopted a stricter pleading standard than the Second Circuit standard. However, the substance of what that higher standard requires is the subject of much debate. Many courts hold that a showing of motive and opportunity no longer suffice but that the standard requires a showing of a high degree of recklessness. *See Novak v. Kaşaks*, 997 F.Supp. 425, 430 (S.D.N.Y.1998)(standard now requires conscious recklessness or actual intent); *In re Olympic Financial Limited Sec. Litig.*, 1998 U.S. Dist. LEXIS 14789, September 10, 1998, (D.Minn.1998)(standard now requires strong inference that defendants acted with fraudulent intent); *In re Glenayre Techs., Inc. Sec. Litig.*, 982 F.Supp. 294, 298 (S.D.N.Y.1997)(standard now requires conscious recklessness which approximates actual intent); *Norwood Venture Corp. v. Converse Inc.*, 959 F.Supp. 205, 208 (S.D.N.Y.1997)(standard now requires facts creating a strong inference of knowing misrepresentation); *In re Baesa Sec. Litig.*, 969 F.Supp. 238, 242 (S.D.N.Y.1997)(standard now requires recklessness constituting behavior that comes close to actual intent); *Voit v. Wonderware Corp.*, 977 F.Supp. 363, 374 (E.D.Pa.1997)(standard now requires conscious behavior). *But see Press v. Chemical Investment Services Corp.*, 166 F.3d 529 (2d Cir.1999)(recognizing that the reform act heightened the pleading standard, but applying the Second Circuit standard requiring motive and opportunity or circumstantial evidence of conscious misbehavior or recklessness).

### B. Eastern District of Michigan Cases

Two district courts in this division have reached a similar conclusion that the PSLRA heightened the standard beyond the Second Circuit pleading level. *See, Havenick, et. al. v. Network Express, Inc.*, 981 F.Supp. 480 (E.D.Mich.1997)(Rosen, J.); *In re Comshare Inc. Securities Litigation*, 1997 WL 1091468, 1997 U.S. Dist. LEXIS 17262 (E.D.Mich.1997)(Zatkoff, J.). In *In re Comshare*, Judge Zatkoff articu-

lated the standard for scienter as requiring the plaintiff to "plead specific facts that create a strong inference of knowing misrepresentation on the part of the defendants." *In re Comshare,* 1997 WL 1091468 at *4, 1997 U.S.Dist. LEXIS at *19., citing *In re Silicon Graphics, In. Sec. Litig.,* 1996 WL 66439, *5–7 (N.D.Cal. 1996); *Friedberg v. Discreet Logic, Inc.,* 959 F.Supp. 42, 49 (D.Mass.1997); *Norwood Venture Corp. v. Converse Inc.,* 959 F.Supp. 205, 208 (S.D.N.Y.1997).

Likewise in *Havenick,* Judge Rosen required a similar heightened showing of knowledge on the part of the defendants. Judge Rosen articulated the standard as requiring the "plaintiffs [to] plead with particularity facts giving rise to a strong inference that the defendant(s) acted with fraudulent intent." *Havenick,* 981 F.Supp. at 528.[5]

### C. Other Courts Follow Second Circuit Standard

Other Courts continue to follow the Second Circuit standard, holding that the PSLRA did not heighten the standard beyond the motive and opportunity/recklessness test. *See Press v. Chemical Investment Services,* 166 F.3d 529 (2d Cir. 1999)(copy attached at Plaintiffs' Supplemental Material, Exb. 1); *Williams v. WMX Technologies, Inc.,* 112 F.3d 175 (5th Cir.1997); *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618 (N.D.Tex. 1998); *Gross v. Medaphis Corp.,* 977 F.Supp. 1463 (N.D.Ga.1997); *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.,* N.V., 941 F.Supp. 1369, 1377 (S.D.N.Y. 1996); *Marksman Partners, L.P. v. Chantal Pharm. Corp.,* 927 F.Supp. 1297 (C.D.Cal.1996).

Still other Courts curiously find that while Congress intended to adopt the Second Circuit standard, Congress declined to bind courts to the Second Circuit's interpretation of that standard. *See In re First Merchants Acceptance Corp., Sec. Litig.,* 1998 WL 781118 (N.D.Ill.1998); *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246 (N.D.Ill.1997).

### ii. Legislative History of the PSLRA

██  The crux of the dispute here lies in the parties' interpretation of the legislative history surrounding the PSLRA. The most reliable source for Congressional intent is the Conference Committee Report. *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). "[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represent the considered and collective understanding of [the members of Congress] involved in drafting and studying proposed legislation.'" *Id.,* quoting *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969). On the issue of the heightened pleading standard, the Conference Committee Report states:

### REQUIREMENTS FOR SECURITIES FRAUD ACTIONS

Heightened Pleading Standard

Rule 9(b) of the Federal Rules of Civil Procedure requires that plaintiffs plead allegations of fraud with "particularity." The Rule has not prevented abuse of the securities laws by private litigants. [footnote omitted] Moreover, the courts of appeals have interpreted Rule 9(b)'s requirement in conflicting ways, creating distinctly different standards among the circuits. [footnote omitted] The House and Senate hearing on securities litigation reform included testimony on the need to establish uniform and more stringent pleading requirements to curtail the filing of meritless lawsuits.

The Conference Committee language is based in part on the pleading standard of the Second Circuit. The standard also is specifically written to conform

---

**5.** The Sixth Circuit has not had an occasion to address this issue. Although the plaintiffs in *Havenick* appealed Judge Rosen's decision granting defendants' motion to dismiss, the parties subsequently settled the matter prior to oral argument in the Sixth Circuit. The parties stipulated to a dismissal of the appeal. Ct.App. No. 97–2144.

the language to Rule 9(b)'s notion of pleading with "particularity."

Regarded as the most stringent pleading standard, the Second Circuit requirement is that the plaintiff state facts with particularity, and that these facts, in turn, must give rise to a "strong inference" of the defendant's fraudulent intent. *Because the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard.* [FN23] The plaintiff must also specifically plead with particularity each statement alleged to have been misleading. The reason or reasons why the statement is misleading must also be set forth in the complaint in detail. If an allegation is made on information and belief, the plaintiff must state with particularity all facts in the plaintiff's possession on which the belief is formed. [FN23] For this reason, the Conference Report chose not to include in the pleading standard certain language relating to motive, opportunity, or recklessness. Committee Conference Report at 37 (emphasis added).

It is clear from the Conference Report language that Congress did not intend to codify the Second Circuit's case law which required a plaintiff to plead with particularity facts giving rise to a "strong inference of fraudulent intent, by showing (1) a motive and opportunity for committing fraud or (2) circumstantial evidence of either reckless or conscious behavior." *Havenick v. Network Express, Inc.,* 981 F.Supp. 480, 527 (E.D.Mich.1997). *See, e.g., In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 268–69 (2d Cir. 1993). The Conference Committee's notation in footnote 23 lends support to this conclusion. Indeed, the Senate's version of the bill tracked the language of the Second Circuit's test. However, the amendment was deleted by the Committee. *See generally,* Richard H. Walker & J. Gordon Seymour, *Recent Judicial and Legislative Developments Affecting the Private Securities Fraud Class Action,* 40 ARIZ.L.REV. 1003, 1024 (1998).

Instead, it is clear that Congress intended to "strengthen existing pleading requirements." Conference Report at 37. President Clinton recognized that the Act did not codify the Second Circuit's test when he vetoed the bill. President Clinton's veto message stated, "I am prepared to support the high pleading standard of the U.S. Court of Appeals for the Second Circuit—the highest pleading standard of any Federal circuit court. But the conferees make crystal clear in the Statement of Managers their intent to raise the standard even beyond that level. I am not prepared to accept that." H.R. Doc. No. 104–150, 104th Cong., 1st Sess. 240 (1995).

The President's veto was subsequently overridden, further evidence that Congress intended to heighten the pleading standard beyond the Second Circuit's level. *In re Silicon Graphics, Inc. Securities Litigation,* 1996 U.S. Dist. LEXIS 16989, at *16 (N.D.Cal.1996), *modified in part,* 970 F.Supp. 746 (N.D.Cal.1997). *Accord, Havenick, et. al. v. Network Express, Inc.,* 981 F.Supp. 480 (E.D.Mich.1997)(Rosen, J.); *In re Comshare Inc. Securities Litigation,* 1997 WL 1091468, 1997 U.S. Dist. LEXIS 17262 (E.D.Mich.1997)(Zatkoff, J.).

In arguing that *Comshare* and *Havenick* misinterpreted the legislative history, Plaintiffs point to the individual comments of Senators Dodd and Domenici, who, after the President's veto, indicated that the new law did codify the Second Circuit standard. However, the individual statements of Senators, who may comment on a bill's meaning is not the best indicator of Congressional intent. As the Supreme Court has reminded us, "the [conference] committee's unambiguous and unaltered treatment of [the issue] is more probative of congressional intent than the casual remark of a single Senator in the floor debate." *Chandler v. Roudebush,* 425 U.S. 840, 858, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976).

Plaintiffs also rely on the amicus briefs filed by the SEC in the *Comshare* appeal to the Sixth Circuit. The SEC's position is that pleading "recklessness" was, at the time of the PSLRA's passage, sufficient to satisfy the pleading standards in most circuits. The SEC contends that "it follows that the plaintiffs must be allowed to plead that defendants acted recklessly." (Plaintiff's Brief at 11). The SEC's view on this issue, however, is not controlling. Where Congress has directly spoken on an issue, and the intent of Congress is clear, "the court as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The SEC's position about the strength of the pleading standard under the PSLRA is not entitled to deference because the SEC is not empowered to administer the Act, as it only applies to private securities fraud actions; and further Congress has expressed its clear intent to (1) strengthen existing pleading requirements and (2) exclude language related to motive, opportunity or recklessness. It is difficult to understand how a clear intent to adopt a more stringent standard could be interpreted as having adopted the existing pleading standard.

Furthermore, the state of the law at the time the PSLRA was passed was not as clear as the Plaintiffs and the SEC contend when it comes to the question of whether recklessness sufficed to adequately plead scienter. On at least two occasions, the Supreme Court questioned whether recklessness was sufficient to impose liability under Section 10(b). *See Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 166–67, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)(holding plaintiffs may not maintain aiding and abetting suit under Section 10(b) and noting that recklessness, not intentional wrongdoing, was the theory of liability underlying the aiding and abetting allegations); *Aaron v. SEC*, 446 U.S. 680, 690, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)(reserving judgment, but noting the words of the statute quite clearly indicate intent to proscribe only knowing or intentional misconduct); *see also, Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)(wording of the statute suggests that Section 10(b) was intended to proscribe knowing or intentional misconduct).

■ Having reviewed the applicable legislative history, and considered the parties' arguments, this Court is satisfied that Congress intended to heighten the pleading standard beyond the Second Circuit's level. The Court is satisfied with the standard as articulated by two other judges of this district. Accordingly, in testing the sufficiency of the complaint in this matter with respect to whether the Plaintiffs have adequately plead scienter, the Court will determine whether Plaintiffs have plead with particularity facts giving rise to a strong inference of conscious behavior, i.e. a knowing misrepresentation, on the part of the Defendants. A showing of motive and opportunity or mere recklessness will not suffice.

### D. Plaintiffs have failed to adequately plead scienter

In order to demonstrate scienter on the part of the Defendants, Plaintiffs point to four primary sources of knowledge (1) the Akron Litigation, which Plaintiffs contend demonstrates defendants' knowledge (a) that dealerships sold overvalued junk cars, (b) that the consumers would default on their loans, and (c) that the collateral securing the loans was inadequate; (2) the sale of stock by Foss and Beckman during the class period; (3) the sheer magnitude of the increase to the loan loss reserves; and (4) the alleged GAAP violations. As discussed below, none of these sources result in the requisite showing of a strong inference of conscious behavior on the part of the Defendants.

### 1. Akron Litigation

In *In re Comshare Sec. Litig.*, 1997 WL 1091468, 1997 U.S.Dist. LEXIS 17262 (E.D.Mich.1997)(Defendants' Exb. D), the plaintiffs' complaint was deemed to be inadequate due to failure to allege the requisite scienter. In that case the company discovered and announced that employees of its U.K. office gave "side letters" to customers, giving those customers the right to return certain products. The result was that the revenue on the sales of those products was recognized prematurely in violation of GAAP. The Plaintiffs attempted to demonstrate knowledge that defendants had overvalued revenue by pointing out that (1) the side letters which were given out were available for inspection by each of the defendants; and (2) some of the defendants sold stock within the class period. The Court, applying the same pleading standard applicable here, held that "merely pleading that the information was available to the defendants is not enough. Although that may, or may not, suffice to establish recklessness, it does not create a strong inference of conscious misbehavior ... Nowhere does the complaint state which defendants knew what; or how and why they knew it. Simply alleging that the defendants knew or should have known of a problem at the foreign subsidiary because of their position in the company and the fact that documents were available to them does not raise a strong inference of fraudulent intent." *Id.* at *8, 1997 U.S.Dist. LEXIS at *24–25.

Likewise here, Plaintiffs' attempts to show knowing misrepresentations based on the testimony from the Akron Litigation and the fact that Foss and Beckman sold stock are unavailing. Plaintiffs contend that the Akron Litigation reveals that Foss, CAC's CEO, owned Larry Lee's Auto and that the dealership engaged in practices aimed at overvaluing used cars. From this, Plaintiffs extrapolate that Defendants somehow knew that consumers would default on their loans once the cars broke down and knew that collateral was inadequate to cover potential defaults.

This does not follow. Plaintiffs charge Beckman and Roberts with knowledge of practices at Larry Lee's based solely on their positions within CAC. Plaintiffs do not allege that Beckman and Roberts had any role whatsoever in the management of Larry Lee's.

As for the knowledge of Foss, who owned Larry Lee's, Plaintiffs contend he was active in the day-to-day management of that dealership. (Complaint ¶¶ 102–105) However, the portions of the depositions from the Akron Litigation they refer to do not support this conclusion, nor do plaintiffs contend he was active in the day-to-day operations during the class period.

Significantly, even assuming that Foss had knowledge of the business practices at Larry Lee's and assuming that those practices were less than above board, those allegations do not support the contention that the Defendants had knowledge that the business practices of the other 2,400 unaffiliated dealerships were similarly shoddy. Plaintiffs attempt to use the testimony regarding one of eleven dealerships owned by Foss as an indication of knowledge on the part of the Defendants that overvaluing used cars was a common practice among the dealerships with which CAC did business does not give rise to a strong inference that Defendants knew their loan loss reserve pool was inadequate.

### 2. The Stock Sales by Foss and Beckman

The stock sales by Foss and Beckman during the class period also do not give rise to a strong inference that Defendants acted with conscious knowledge that the loan loss reserves were inadequate. First of all, an attempt by Plaintiffs to use stock sales to demonstrate knowledge is a classic example of the "motive and opportunity" test, which this Court has held no longer suffices to allege scienter in the wake of the PSLRA.

Nevertheless, even if the Court were to consider the stock sales, they do not sup-

port an inference that Defendants acted with fraudulent intent. Stock sales by officers does not give rise to fraudulent intent unless the sales are unusual or suspicious. *Silicon Graphics II,* 970 F.Supp. at 767 (citing *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995).) A stock sale is considered unusual when it is "in amounts dramatically out of line with prior trading practices, at time calculated to maximize personal benefit from undisclosed information." *Comshare,* at *9, U.S.Dist. LEXIS at *27, quoting *Marksman Partners L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1312 (C.D.Cal.1996).

A close examination of the stock sales reveals that they do little to reveal fraudulent intent. Plaintiffs allege Foss sold 2,425,000 shares. The September 26, 1995 Prospectus for CAC's offering of 5,500,000 shares for sale discloses that of the 5,500,000 shares, 3,900,000 were offered by CAC and 1,600,000 were offered by Foss. Foss had additionally granted the Underwriters an option to buy 825,000 shares to cover over-allotments. Upon completion of the offering, Foss still owned 54.6% of CAC. Prior to the sale, he owned 26.4 million shares, or 63.7% of the company's common stock. Foss' sale of over two million shares represented only 9% of his pre-sale holdings. Many courts have held that the inference of scienter is weak where an officer sells only a small fraction of the shares owned. *Marksman Partners,* 927 F.Supp. at 1312; *Acito,* 47 F.3d at 54 (sale of less than 11% of stock holdings did not give rise to strong inference of scienter); *Glenayre Techs.,* 982 F.Supp. at 294 (sales ranging from 4.9% to 12.4% of defendants' stock holdings insufficient to allege requisite scienter); *Havenick,* 981 F.Supp. at 528 (any inference of scienter from stock sales rebutted by the fact that defendants retained from 68–85% of their holdings).

Furthermore, Foss made the sale early on in the class period. Therefore the temporal proximity between the stock sale and subsequent drop in earnings is lacking. It is difficult to understand how it can be assumed from this stock sale that Foss acted with fraudulent intent. It seems unlikely that Foss would engage in a scheme to inflate the company's earnings after he sold his stock early on in the class period, and yet fail to sell any of his remaining shares at "artificially inflated prices." Foss, as 52.8% owner of CAC, lost more than any other individual when the price of stock plummeted in response to the implementation of the new software program.

Beckman sold 80,000 shares during the class period. Specifically, 40,000 were sold on October 25, 1995 and an additional 40,000 shares were sold over the time period from January 27, 1997 through January 31, 1997. (Defendants' Exb. M) That same document reveals that Beckman maintained a constant stock ownership level during the time period of 12,500 shares due to the exercise of employee stock options. Following the second sale of 40,000 shares, Beckman continued to own options on 530,000 shares. The ownership of options must be considered in evaluating the Defendants stock sale activities. *See Silicon Graphics II,* 970 F.Supp. at 768. Also, the first sale of 40,000 shares was early on in the class period and the second sale of 40,000 shares was ten months prior to the adjustment for loan loss reserves. This temporal distance weakens any inference of intent that may be drawn from the sales. Neither Beckman nor Foss' stock sales are unusual.

Furthermore, the Complaint does not allege any stock sales whatsoever by Roberts, CAC's Chief Financial Officer. It seems as though the CFO would have been an essential participant in any fraudulent scheme to defraud the company. The fact that he did not sell any shares during the class period undermines the suggestion that the Defendants engaged in securities fraud in order to profit from their own stock sales. In *Comshare,* the Court noted: "the CEO and CFO would have been essential participants in any scheme, thus, their having sold no stock, undermines any suggestion of knowledge on the part of defendants due to the other sales." *Coms-*

*hare,* 1997 WL 1091468 at *10, 1997 U.S. Dist. LEXIS 17262 at *28–29.

### 3. Plaintiff's Complaint Also Fails Under a Recklessness Analysis

All of the cases discussed in this section can be distinguished in that they apply the Second Circuit analysis, or at least allow for a pleading of recklessness. As discussed, *supra,* this Court disagrees with this pleading standard. Nevertheless, even if recklessness were sufficient, Plaintiffs' complaint fails to meet that standard in any event.

### a. Magnitude of the Adjustment to Loan Loss Reserves

The next proposed source of knowledge is the sheer magnitude of the increase in loan loss reserves at the end of the class period. The magnitude of the increase in this case, while it may give rise to recklessness, is not sufficient, to give rise to a strong inference of conscious fraudulent intent on the part of the Defendants. Plaintiffs rely primarily upon *Rehm v. Eagle Finance Corp.,* 954 F.Supp. 1246 (N.D.Ill.1997).

The court in *Rehm* tested the sufficiency of the Complaint based on the Second Circuit's standard. The *Rehm* Court articulated the standard as follows: "In order to withstand a motion to dismiss, plaintiff may . . . allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 1255. This Court has held, *supra,* that pleading recklessness is not sufficient in light of the PSLRA and Supreme Court precedent. Therefore, *Rehm* is unconvincing in that regard.

Nevertheless, if this Court were to employ a recklessness analysis, *Rehm* is still not convincing on the facts alleged before this Court. Although *Rehm* is similar factually because it involves a claim of securities fraud against sub-prime automobile lenders, it is distinguishable in other critical aspects.[6]

*Rehm* involved a securities class action suit against a defendant who was in the business of loaning money to sub-prime automobile dealers. The defendant was alleged to have overstated its revenues, and understated its loan loss reserves during the class period. The class period ended when the defendant company announced a restatement of its 1995 financial results, which included a 91% decrease in previously reported earnings and an increase of approximately 300% in its provision for credit losses. The court, in denying the defendant's motion to dismiss, stated, "While is it true that the mere fact that a company's financial reporting was inaccurate does not establish scienter . . . the magnitude of reporting errors may lend weight to allegations of recklessness where defendants were in a position to detect errors." *Id.* at 1256.

The *Rehm* Court added that the alleged GAAP violation did not stand alone in evidencing intent. In addition, plaintiffs alleged that the defendants reassured the public that the loan loss provisions were adequate only two weeks before announcing that they were severely deficient. On March 13, 1996, several analysts lowered their ratings on defendant's stock due to what they perceived to be inadequate loan loss reserve figures. *Id.* at 1250. Two days later, the company responded by assuring the investing public that "it is our considered judgment, which is supported by our independent outside auditors, that the level of reserves taken against this

---

6. Plaintiffs cite to three other cases which are factually similar to the case at bar. *See In re Olympic Fin. Ltd. Sec. Litig.,* 1998 U.S.Dist. LEXIS 14789, at *11, No. 97–496 (D.Minn. Sept. 10, 1998)(Plaintiff's Response Brief Exb. B)("Plaintiffs make numerous assertions regarding internal actions taken by Olympic which suggest that Defendants may have known that they were overstating Olympic's

financial health"); *In re First Merchants Acceptance Corp. Sec. Litig.,* 1998 WL 781118 (N.D.Ill. Nov. 4, 1998)(applying motive and opportunity test and/or recklessness test to complaint); *In re Mercury Fin. Litig.,* No. 97 C 3035 (N.D.Ill. Nov. 4, 1998)(Plaintiff's Response Brief Exb. A). As demonstrated *infra,* each is factually distinguishable from the Plaintiffs' case here.

portfolio is adequate." *Id.* Approximately two weeks later, on April 2, 1996, the company announced that it was "unexpectedly" advised that it must account for a drastic increase in the loss reserve pool. *Id.*

The *Rehm* court emphasized that it was the magnitude of the loss, in connection with the recent reassurances, that gave rise to the inference of recklessness: "We find that the crucial significance of accurate credit loss accounting in determining the financial viability of Eagle, *combined with the defendants' careful statements mitigating the seriousness of the credit loss problem,* raises a strong inference that defendants acted with knowledge of their public misstatements or were wilfully blind to the truth." *Id.* (emphasis added).

Here, while the magnitude of the loan loss adjustment was great, there is no allegation of recent reassurance on the part of the Defendants. Plaintiffs contend that Defendants misled analysts during a "road show" in September 1995 when CAC was issuing its secondary offering. Plaintiffs have not demonstrated which Defendants made which statements, nor have they identified which statements were misleading and why. Further, the misrepresentations Plaintiffs allege Defendants made to analysts were allegedly made in September 1995, nearly three years before the adjustment was made to the reserve for credit losses, not two weeks before the adjustment. This lack of temporal proximity fails to give rise to either a strong inference of a knowing misrepresentation, nor does it give rise to recklessness.

Plaintiffs also rely upon *In re Olympic Financial Ltd. Sec. Litig.,* 1998 U.S.Dist. LEXIS 14789 (D.Minn. Sept. 10, 1998)(Plaintiff's Appendix, Exb. B). In *Olympic,* the plaintiffs alleged "numerous assertions regarding internal actions taken by Olympic which suggest that Defendants may have known that they were overstating Olympic's financial health." *Id.* at *11. For example, plaintiffs in *Olympic* pointed to (1) extensions of loan payment terms, (2) rewriting of loans, (3) refinancing of

repossessed collateral, (4) internal audit reports that reflected a continuing deterioration in underwriting quality and (5) instructions to credit examiners to exclude problem loans from the sampling process. *Id.* at *7–8. These facts clearly give rise to the notion that Olympic's financial health may be overstated. Plaintiffs allege no such facts here. In fact, Plaintiffs do not allege any specific facts that Defendants were aware of inadequate loan loss reserves.

Another case Plaintiffs rely upon is *In re First Merchants Acceptance Corp. Sec. Litig.,* 1998 WL 781118 (N.D.Ill. Nov. 4, 1998)(Plaintiff's App. at Exb. C). That court, employing the recklessness standard, held that plaintiffs adequately plead scienter. *First Merchants* involved a suit against a company's outside auditors for allegedly failing to recognize deteriorations in the company's loan portfolio. Plaintiffs in that case alleged numerous "red flags," such as dramatic increases in loan delinquencies and overdue receivables, that should have indicated to the auditors that the loan portfolio had weakened. The court in *First Merchants* summarized its holding: "plaintiffs have alleged specific facts giving rise to a strong inference that Deloitte deliberately ignored various warning signs, constituting the recklessness necessary to support § 10(b) liability." *Id.* at *11. "The magnitude of the fraud combined with the allegation that First Merchants' new [CFO] almost immediately discovered discrepancies in the financial statements, suggests a deliberate ignorance on the part of Deloitte." *Id.* Plaintiffs here are unable to allege any red flags suggesting deliberate ignorance on the part of Defendants.

#### b. GAAP Violations

As a final source of scienter, Plaintiffs point to the alleged GAAP violations. First, the Plaintiffs state that "[t]he magnitude of the increased advance reserve losses created a strong inference that a substantial portion of these advance reserve losses should have been incurred

before and during the Class Period." (Complaint ¶ 5) The Plaintiffs claim that the GAAP violations are evidence of conscious or reckless misbehavior. Specifically, Plaintiffs state "The Defendants' violations of GAAP policies were not isolated incidents but were reported over a number of quarters and caused material misstatements of the Company's financial results for those periods. The frequency and magnitude of Defendants' false and misleading statements is strong evidence that Defendants acted with knowledge of the falsity of their statement or, at a minimum, with a conscious disregard for their falsity." (Complaint ¶ 116).

However, the Plaintiffs do not set forth any evidence that Plaintiffs knowingly misrepresented revenue, or knowingly understated the credit for loan loss reserves. None of the financial statements issued during the class period had to be restated, as GAAP policies would require if the reserve was found later to have been materially misstated during the class period. Even assuming that the Defendants violated GAAP, Plaintiffs do not plead any facts giving rise to an inference that Defendants knowingly violated GAAP's provisions.

▇▇▇ As a general rule, GAAP violations or accounting errors, standing alone, do not give rise to scienter. *In re Software Toolworks, Inc. Sec. Litig.*, 50 F.3d 615, 627 (9th Cir.1994). This true even in a situation where a statement of earnings must be re-stated. For example, in *Goldberg v. Household Bank*, 890 F.2d 965, 967 (7th Cir.1989), the court affirmed summary judgment for defendants noting that restatements are common and indicated "the aftermath of negligence at most." Plaintiffs here do not allege reckless, much less conscious, intent to defraud on the part of the Defendants. Plaintiffs do not point to any facts which give rise to any inference that Defendants knowingly misstated revenue or overstated loan loss reserves.

Even if the Court applies the pre-PSLRA Second Circuit standard which allows a plaintiff to show motive and opportunity or recklessness, Plaintiffs' complaint falls short of alleging the requisite scienter. The Plaintiffs have not alleged facts which give rise to a strong inference that Defendants acted with conscious intent to defraud. This deficiency is fatal to the Plaintiffs' claims. 15 U.S.C. § 78u–4(b)(3)(A). Accordingly, the Plaintiffs' complaint must be dismissed.

## V. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

The Defendants' motion to dismiss is GRANTED with prejudice.

Likewise, the motion to strike the affidavit of Michele M. Stanton is GRANTED.

IT IS SO ORDERED.

### JUDGMENT

Being fully advised in the premises, having read the pleadings, and this Court having granted Defendants' motion to dismiss with prejudice, the Court hereby orders as follows:

IT IS ORDERED that judgment be and hereby is entered in favor of the Defendants and against the Plaintiffs in this matter.

IT IS SO ORDERED.