Hiram STURM, et al., Plaintiffs,

v.

MARRIOTT MARQUIS CORP., Host Marriott Corp. and Christopher G. Townsend, Defendants,

and

Atlanta Marriott Marquis Limited Partnership II, Nominal Defendant.

No. CIV.A.1:97–CV3706TWT.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 7, 2000.

Robert J. Abrams, Office of Robert J. Abrams, Atlanta, GA, Lawrence P. Kolker, Robert Abrams, Wolf Halderson Adler Freeman & Herz, New York, NY, Martin D. Chitwood, Cheryl L. Jenkins, Christi Cannon Mobley, Chitwood & Harley, Atlanta, GA, for Plaintiffs.

George Conley Ingram, Todd Richard David, Teresa Thebaut Bonder, Alston & Bird, Atlanta, GA, Tom Alan Cunningham, Debbie Darlow, Cunningham Darlow Zook & Chapoton, Houston, TX, for Defendants.

## ORDER

THRASH, District Judge.

This is an action seeking to recover damages for alleged violations of federal securities law and for state law claims of breach of fiduciary duty and contract. Earlier, the Court dismissed Plaintiffs' federal securities law claims [Doc. 40] pursuant to Fed. R. Civ. Pro. 12(b)(6) and the Private Securities Litigation Reform Act. The Court allowed Plaintiffs leave to file an Amended Complaint [Doc. 52]. The case is now before the Court on Defendants' Motion to Dismiss the Amended Complaint [Doc. 54]. For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion as to Plaintiffs' federal securities law claims and deny the motion as to Plaintiffs' state law claims for breach of fiduciary duty and breach of contract.

## I. BACKGROUND

The facts of this case were fully set forth in this Court's Order on the Motion to Dismiss Plaintiffs' Original Complaint. *See Sturm v. Marriott Marquis Corp.*, 26 F.Supp.2d 1358, 1362–1364 (N.D.Ga.1998). For convenience the relevant facts are reproduced here as well.[1] The Atlanta Marriott Marquis Hotel is a 1,671 room full service luxury hotel located in Atlanta, Georgia. The Hotel is located on about 3.6 acres of land in downtown Atlanta. The Ivy Street Hotel Limited Partnership developed and owns the Hotel. Defendant Host Marriott Corporation is a Delaware corporation and is one of the largest owners of lodging properties in the world. Marriott International Corporation manages hotels. It has a contract with Ivy Street Hotel Limited Partnership to manage the Hotel. Prior to 1995, Marriott International Corporation and Host Marriott were subsidiaries of the same corporate parent.

In the late 1980s, Marriott sponsored a number of Limited Partnerships which were formed to acquire, own and operate certain hotel properties. The Atlanta Marriott Marquis Limited Partnership [hereinafter "Original Limited Partnership"] was created in 1985 for the purpose of acquiring an 80% interest in the Ivy Street Hotel Limited Partnership. In 1985, the Original Limited Partnership purchased the land on which the hotel sits, and leased it to the Ivy Street Hotel Limited Partnership under a long term lease.

The Original Limited Partnership sold 530 Class A partnership interests for $100,000 each [hereinafter "Class A Units"] to 720 Limited Partners. The Sturm Plaintiffs bought one unit. The Limited Partners of the Original Limited Partnership owned 99% of the Class A Units. In addition, the Original Limited Partnership issued Class B partnership interests with no value. Prior to investing in the Original Limited Partnership each Limited Partner certified that he or she was a sophisticated investor. Defendant Marriott Marquis Corporation [hereinafter the "General Partner"] is a subsidiary of Defendant Host Marriott and was the General Partner of the Original Limited Partnership. The General Partner owned one percent of the Class A Units and 100% of the Class B Units. Defendants Bruce E. Stemerman, Robert E. Parsons, Jr., and Christopher G. Townsend [hereinafter the "Individual Defendants"] are all members of the General Partner's Board of Directors and are all officers of Defendant Host Marriott. Defendants Stemerman and Townsend are also the President and Vice–President of the General Partner, respectively.

For a variety of reasons, the hotel and the Original Limited Partnership did not perform as anticipated. Although the investment benefitted the Limited Partners with certain tax losses, cash distributions were less than hoped for and came primarily from the land lease rather than from

---

1. The parties have not pointed out any material inaccuracies in the Court's statement of facts.

positive cash flow from hotel operations. Hotel operations improved in the 1990s. However, by this time the Hotel needed comprehensive renovations. In addition, the Hotel's $217 million mortgage debt was due in July, 1997. The maturity date was extended to February 2, 1998. The Defendants undertook extensive efforts to locate funds for renovations and to refinance the mortgage debt.

The Atlanta Marriott Marquis Limited Partnership II [hereinafter the "New Limited Partnership"] is a Delaware Limited Partnership created in 1997. Defendant Marriott Marquis Corporation is the General Partner of the New Limited Partnership. In November of 1997, the General Partner mailed a Consent Solicitation and Prospectus [hereinafter the "Solicitation"] to the Limited Partners of the Original Limited Partnership. The Solicitation sought approval to merge the Original Limited Partnership into the New Limited Partnership. The proposed merger would result in a one for one exchange of all Class A Units of the Original Limited Partnership for Class A Units of the New Limited Partnership. As a result, the Limited Partners would continue to hold 99% of all Class A Units and the General Partner would hold 1%.

The purpose of the merger, as stated in the Solicitation, was to facilitate the refinancing of the existing mortgage on the hotel and avert foreclosure or a forced sale of the Hotel. In the Solicitation, the Limited Partners were informed of (1) the rationale for the restructuring; (2) the numerous risk factors, including the conflicts of interest and the probability of significantly reduced cash distributions to the Limited Partners; (3) the details of the transactions and restated agreements; and (4) the potential results of either a positive or negative vote by the Limited Partners. In connection with the restructuring, Marriott proposed to contribute an additional $75 million in equity. The General Partner proposed the merger because it did not believe that enough Limited Partners would agree with the restructuring of the Limited Partnership as desired by the General Partner to allow the amendment of the Original Limited Partnership Agreement. A majority of the holders of Class A Units approved the merger as set forth in the Solicitation. The proposed merger was closed and the Original Limited Partnership no longer exists.

The New Limited Partnership is governed by a partnership agreement that is substantially different from that of the Original Limited Partnership. Under the Original Limited Partnership Agreement the rental payments received by the Limited Partnership were automatically distributed to the holders of Class A Units. These payments have accounted for 92% of all distributions actually made to the Limited Partners. In 1994, 1995, and 1996, these payments were $1,869,000, $2,526,000, and $2,806,000, respectively. Under the Original Limited Partnership Agreement, Ivy Street had an option to purchase the land from the Limited Partnership at a set price. As a result of the restructuring, the Limited Partnership conveyed the land to Ivy Street in exchange for a capital credit equal to the exercise price of Ivy Street's option. Following the restructuring, Ivy Street Limited Partnership no longer makes rental payments to the Limited Partnership. Instead of rent payments, the New Limited Partnership is entitled to a ten percent compounding preferred return in its Ivy Street capital account. In reality, this means that the Limited Partners get an accounting entry in the capital account that may never result in an actual distribution of funds.

Under the Original Limited Partnership Agreement, holders of Class A Units were entitled to a ten percent priority return on their investment. Under the New Limited Partnership Agreement, that is reduced to a subordinated five percent return that is paid at the sole discretion of the General Partner. Under the Original Limited Partnership Agreement holders of Class B Units were not entitled to any priority returns. Under the New Limited Partnership Agreement the Holders of Class B

units are entitled to a 13.5% preferred, cumulative, compounded return. The restructuring converted Defendant Host's 20–year non-interest-bearing loan to Ivy Street into a 15–year loan with a nine percent interest rate for the first five years. Furthermore, repayment of this loan is prioritized over payments to the New Limited Partnership. Therefore, the cash flow from the Hotel that previously went first to holders of Class A Units (by way of rents under the Original Limited Partnership distribution scheme) now first goes to repay Defendant Host's new interest bearing loan and then to the holders of Class B Units. In addition, as part of the restructuring, Defendant Host was released from its guarantee of up to $50 million on the original mortgage. All of these changes in the rights of the Limited Partners were disclosed in the Solicitation.

Under the Original Limited Partnership Agreement neither the General Partner nor its affiliates were allowed to vote its Units. Under the New Limited Partnership Agreement, the General Partner and its affiliates have the same voting rights as other holders of Class A Units. Under the Original Limited Partnership Agreement a majority of the holders of Class A Units had to consent before the General Partner could sell the Hotel or the land. Under the New Limited Partnership Agreement, the General Partner can sell the Hotel without the consent of any of the holders of Class A Units as long as the buyer is not an affiliate of the General Partner. Under the Original Limited Partnership Agreement, the General Partner could not amend any agreement between the partnership and the General Partner or its affiliates without the consent of a majority of the holders of Class A Units. Furthermore, the General Partner could not increase its or its affiliates' compensation under the agreement. Under the New Limited Partnership Agreement, the General Partner can amend the Agreement without the consent of the Limited Partners to increase it or its affiliates' compensation as long as it does not exceed the market rate.

Under the New Limited Partnership Agreement, a vote of two-thirds of the holders of Class A Units is required to remove the General Partner. Under the Original Limited Partnership amendments to the Agreement required a majority or unanimity of the holders of Class A Units. Under the New Limited Partnership Agreement, amendments to the Agreement require a majority or unanimity of the holders of Class A Units except where the General Partner considers it necessary to "clarify" the agreement. No consent by the Limited Partners is required as long as the clarification does not materially affect the Limited Partners. All of these changes in the Partnership Agreement were disclosed in the Solicitation.

On December 12, 1997, the merger of the Original Limited Partnership into the New Limited Partnership was approved by a majority of the Limited Partners. By the end of December, the merger was closed. The Plaintiffs filed this action prior to the closing of the merger. They contend that the merger was unfair to the Limited Partners because no independent entity represented the interests of the Limited Partners in the reorganization and restructuring of the Limited Partnership; there was no appraisal of the Hotel; there were no arms-length negotiations on behalf of the Limited Partners; alternatives to the restructuring were not explored; and the terms of the restructuring benefitted the General Partner and the other Marriott entities to the unfair detriment of the Limited Partners. The Defendants contend that the restructuring was necessary to prevent foreclosure or a forced sale of the Hotel, and that the terms of the merger and its financial consequences to the Limited Partners was fully and completely disclosed in the Solicitation.

Defendants moved to dismiss the original Complaint for failure to state a claim. After conducting a hearing, and considering the above facts, the Court issued an Order on November 16, 1998, dismissing all of Plaintiffs' federal securities law

claims. With leave to amend, Plaintiffs filed an Amended Complaint. The Amended Complaint repeats and restates much that was in the original Complaint regarding the unfairness of the merger to the Plaintiffs. With respect to their Section 10(b) claim, Plaintiffs make two new allegations. First, they claim that the Defendants falsely state in the Solicitation that they had been unable to find a lender willing to refinance the mortgage on the Hotel. Second, Plaintiffs claim that the Defendants failed to disclose their plans to merge the New Limited Partnership into a Real Estate Investment Trust ("REIT").

In addition, Plaintiffs have materially changed their allegations concerning the value of the Hotel. In the original Complaint, Plaintiffs alleged that the Defendants failed to disclose that the fair market value of the land and the hotel exceeded $300 million. The Solicitation stated that the Defendants' advisor had concluded that the property was worth $250–255 million.[2] This claim is not repeated in the Amended Complaint. In the Amended Complaint, Plaintiffs allege that the Defendants did not commission an appraisal of the Hotel or obtain appraisals from others. (Amended Complaint, ¶ 65.) The Plaintiffs do allege that the Defendants had an appraisal indicating that the Hotel was worth $20 million more than they stated in the REIT Registration Statement. (Amended Complaint, ¶ 90.)

On April 17, 1998, roughly three months after the limited partnership merger closed, Host announced that its Board of Directors had authorized the company to restructure its business to qualify as a REIT. Host also announced that, as part of the REIT conversion, Host expected to form a new umbrella operating partnership (the "Operating Partnership") that would own substantially all of its full-service lodging properties. Details of the REIT conversion were contained in a Registration Statement filed with the SEC on October 8, 1998.

Limited partners in the New Limited Partnership (and those in seven other publicly held partnerships owning various other hotels) were given the opportunity to vote on a merger of their partnerships into a subsidiary entity of the Operating Partnership. Each limited partner in the New Limited Partnership was sent the Prospectus/Consent Solicitation Statement in October 1998 ("REIT Statement"). As disclosed in the REIT Statement, the REIT Conversion contemplated that Host and the limited partnerships would contribute their full-service hotel properties and certain other businesses and assets to the Operating Partnership in exchange for units of limited partnership interest in the Operating Partnership ("OP Units").

Through the REIT Conversion, the Operating Partnership proposed to acquire by merger (the "REIT merger") eight limited partnerships, including the New Limited Partnership, which owned full-service hotels in which Host or its subsidiaries were general partners. As fully described in the REIT Statement, limited partners of those partnerships that participated in the REIT merger would receive Operating Partnership Units, or "OP Units", in exchange for their partnership interests in such partnerships. Following the REIT Conversion, limited partners could elect to maintain the OP Units (with certain redemption rights beginning one year after the REIT Merger), or exchange them for either shares of common stock of Host REIT, or notes issued by the Operating Partnership. The exchange value of each participating limited partnership was equal to the greatest of the values estimated by three different methods described in the REIT Statement. One of these methods, the "Adjusted Appraised Value," placed the value of the Hotel at $255 million.

**2.** In the earlier Order, the Court found that this claim adequately alleged a material false statement, but that insufficient facts were alleged to show scienter under the standard required by the Private Securities Litigation Reform Act.

As part of the REIT Statement, the limited partners were asked to approve amendments to the New Limited Partnership Agreement. These included an amendment that waived the requirement that an appraisal process, consisting of at least two independent appraisals, must be conducted in the event of a proposed sale of the Hotel to Host or its affiliates. Plaintiffs allege that the presentation of the REIT Merger to a vote of the limited partners without complying with this appraisal process (on the assumption that these amendments would be approved) constituted a violation of the "anti-bundling" regulations contained in SEC Rules 14a–4(a)(3) and 14a–4(b)(1). The REIT merger and partnership amendments were overwhelmingly approved by the voting limited partners in all eight partnerships. The REIT merger was consummated on December 30, 1998. As a result, the New Limited Partnership no longer exists.

As noted above, in their Amended Complaint, Plaintiffs also allege that Defendants failed to disclose that, prior to the issuance of the REIT Statement, they had in their possession an appraisal that valued the Hotel at approximately $20 million more than the AAA appraisal utilized pursuant to the REIT merger. On January 13, 1998, Host received from Arthur Consulting an appraisal report for the Hotel. This report determined that using the discounted cash flow method—which was deemed by Arthur Consulting to be the most widely accepted approach—the Hotel was worth approximately $275 million prior to deductions for deferred maintenance. The AAA appraisal valued the Hotel at $255 million. In voting upon the REIT merger, the limited partners had only the AAA Appraisal at their disposal. Plaintiffs allege that if the "Estimated Continuation Value" had been based upon an appraisal of $275 million, the per Unit conversion value would have increased from $45,525 to approximately $79,000.

## II. *MOTION TO DISMISS STANDARDS*

In considering a motion to dismiss, the Court must accept the allegations in the Plaintiffs' complaint as true and must construe those allegations in the light most favorable to the plaintiff. *Bank v. Pitt,* 928 F.2d 1108, 1109 (11th Cir.1991). Furthermore, the Court should ignore any allegations which contain no more than opinions or legal conclusions. *South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 409 n. 10 (11th Cir.1996). The Court may grant a defendant's motion to dismiss only if it appears beyond doubt that the plaintiff can prove no set of facts which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Milburn v. United States,* 734 F.2d 762, 765 (11th Cir.1984).

## III. *DISCUSSION*

### A. *SECTION 10(B) AND RULE 10(B)–5 EXCHANGE ACT CLAIMS*

#### 1. *ELEMENTS OF THE CLAIMS*

In Count I of the Amended Complaint, Plaintiffs contend that Defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) [hereinafter "Section 10(b)"], and 17 C.F.R. § 240.10b–5 [hereinafter "Rule 10(b)–5"] by making false statements and concealing material facts in connection with the restructuring of the New Limited Partnership. Section 10(b) of the Exchange Act makes it unlawful for any person to use, in connection with the sale of any security, any deceptive device in contravention of such rules and regulations as the SEC may prescribe. 15 U.S.C. § 78j(b). Rule 10(b)–5 prohibits the making of any untrue statement of material fact or the omission of a material fact that would render statements misleading. 17 C.F.R. § 240.10b–5.

Before addressing the merits of the 10b–5 claim, the Court will address Defendants' argument that they cannot be

sued for securities fraud. Defendants contend that because they are accused of mismanagement they may not also be accused of securities fraud. In *Santa Fe·Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court held that Section 10(b) does not authorize a cause of action for internal mismanagement or breach of fiduciary duty by majority shareholders absent any deception, misrepresentation or nondisclosure. Allegations of mismanagement and breach of fiduciary duty do not, however, bar a claim for securities fraud if the elements of such a claim are adequately pleaded. To state a claim under Rule 10(b)–5, a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused the Plaintiffs' injury. *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997). It is undisputed that the Limited Partners relied on the Solicitation in approving the limited partnership merger and relied on the REIT Statement in approving the REIT conversion.

■■■ A Rule 10(b)–5 claim must state the circumstances constituting fraud with sufficient particularity to satisfy the requirements of Federal Rule of Civil Procedure 9(b). *Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1470 (N.D.Ga.1997). A fraud claim meets the requirements of Rule 9(b) if it sets forth precisely what statements or omissions were made in what documents or oral presentations, who made the statements, the time and place of the statements, the contents of the statements or manner in which they misled the plaintiff, and what the defendants gained as a consequence. *Brooks v. Blue Cross and Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir.1997). Recently, Congress passed the Private Securities Litigation Reform Act of 1995 ("Reform Act"), Pub.L. No. 104–67, 109 Stat. 743 (codified at 15 U.S.C. § 78u–4(b)). The Reform Act requires a securities-fraud plaintiff to "specify each statement alleged to·have

been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). If an allegation regarding a statement or omission is made on information and belief, the complaint must state with particularity the facts on which the belief is formed. *Id.* Further, as to each statement or omission, plaintiffs must set forth particular facts that give rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2). A complaint that fails to comply with any of these requirements must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A).

The Eleventh Circuit, in the recent case of *Bryant v. Avado Brands,* 187 F.3d 1271 (11th Cir.1999), addressed two of the legal issues that must be resolved in ruling upon the Motion to Dismiss. First, it held that "the district court was authorized at the motion to dismiss stage to take judicial notice of relevant public documents required to be filed with the SEC, and actually filed, for the purpose of determining what statements the documents contain." *Id.* at 1280. Second, it held that a plaintiff must plead scienter by alleging with particularity facts which at least give rise to a strong inference that the defendant acted in a severely reckless fashion. *Id.* at 1284–85. Allegations showing motive and opportunity standing alone are insufficient. *Id.* Both of these issues must now be addressed in the context of this case.

### 2. MATTERS OUTSIDE THE PLEADINGS

In considering a motion to dismiss, the Court may not normally rely on evidence outside of the pleadings. The parties have both submitted copies of the Solicitation for the limited partnership merger and the Plaintiffs heavily rely on this document and the REIT Statement in their Amended Complaint. At oral argument on the Motion to Dismiss the Original Complaint, counsel for the Plaintiffs specifically agreed that the Court should consider the Solicitation in ruling on the Motion to Dismiss. In addition, the Solicitation and the

REIT Statement fall squarely within the holding of the Eleventh Circuit in *Bryant.* Therefore, as with the earlier Motion to Dismiss, the Court will consider these documents in analyzing the Defendants' Motion to Dismiss the Amended Complaint for failure to state a claim.

In their response to certain allegations of the Amended Complaint, Defendants rely on an appraisal report from Arthur Consulting and a loan proposal from Goldman Sachs. They have attached copies of the documents to their Motion to Dismiss the Amended Complaint. Defendants contend that these documents are the source of the allegations in the Amended Complaint relating to the availability of alternate means of refinancing the mortgage on the Hotel and the alleged understatement of the Hotel's value. Plaintiffs do not dispute the authenticity of the documents, but they do argue that the Court cannot consider either of these documents on a 12(b)(6) motion.

The Eleventh Circuit has held that extrinsic documents can be considered where those documents are referred to in the complaint and are "central to the plaintiff's claim." *Harris v. Ivax Corp.,* 182 F.3d 799, 802, n. 2 (11th Cir.1999); *Brooks,* 116 F.3d at 1369. The Goldman Sachs and Arthur Consulting documents do not meet the judicial notice standard adopted by the Eleventh Circuit in *Bryant.* In *Bryant,* the Eleventh Circuit noted the line of cases where courts have allowed authentic documents, whether or not filed with the SEC, to be considered on a motion to dismiss if they are referred to in the plaintiff's complaint and are central, or integral, to the plaintiff's claim. *Bryant,* 187 F.3d at 1281, n. 16. *See Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546 n. 9 (8th Cir.1997); *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.,* 7 F.3d 357, 368 n. 9 (3rd Cir.1993), *cert. denied Gollomp v. Trump,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). This is sometimes referred to as the "incorporation by reference doctrine." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999). Plaintiffs contend that the documents are not "central" to their case because they do not govern the transactions at issue and do not contain the misrepresentations alleged in the Amended Complaint. The Court concludes that the Arthur Consulting and Goldman Sachs documents should be considered in ruling upon the Motion to Dismiss. The Reform Act contemplates that the district courts will serve a gatekeeping role at the motion to dismiss stage of private class action securities fraud cases. *In re Credit Acceptance Corp. Sec. Litig.,* 50 F.Supp.2d 662, 670 (E.D.Mich.1999). In such cases, the plaintiffs are required, when they rely upon information and belief, to "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Frequently, this obligation will be satisfied by reference to documents. The district courts cannot fulfill their gatekeeping role if plaintiffs are free to quote selectively or out of context from the documents that they rely upon, and avoid further examination of the documents by not attaching them to the complaint. *Malin v. IVAX Corp.,* 17 F.Supp.2d 1345, 1351 (S.D.Fla.1998). In this case, Plaintiffs urge the Court to adopt a very narrow and restrictive standard for invoking the incorporation by reference doctrine. No persuasive authority has been cited for this in the context of a private securities class action, and such a narrow and restrictive standard is inconsistent with the Court's gatekeeping function under the Reform Act. The Court will consider the Goldman Sachs and Arthur Consulting documents. Nevertheless, their significance and interpretation may depend upon other evidence that clearly cannot be considered at the motion to dismiss stage. Therefore, any ambiguity in the documents will be construed in favor of the Plaintiffs. *See Brooks,* 116 F.3d at 1369.

### 3. FALSE STATEMENTS OR OMISSIONS

As in their original Complaint, Plaintiffs allege that the Solicitation contains materi-

ally false and misleading statements and omissions upon which the Limited Partners relied in approving the merger. They further contend that the Defendants made a false statement regarding the availability of alternative means of refinancing the Hotel's mortgage. Specifically, they point to the following statement in the Solicitation:

> Initially the General Partner informally contacted several lenders from whom the General Partner's affiliates have obtained financing in the past. Next, the General Partner directly and indirectly (through a broker) solicited eight lenders in the hotel lending market, describing the current financial condition of AMMLP and the Hotel and requesting proposals to refinance the approximately $217 million mortgage debt then encumbering the Hotel. The request for proposals was not limited solely to first mortgage financing, but sought terms for first mortgage and subordinated financing or a combination of debt and equity financing. *The General Partner could not identify a potential lender that would provide the requested financing.* In addition, the request for refinancing proposals did not take into account the additional approximately $19.4 million in funds that are required for capital expenditures and room renovations. [emphasis added]

They contend that "[t]his statement was false and misleading in light of the fact that on March 21, 1997, Host received a detailed proposal from Goldman, Sachs & Co. to refinance the Mortgage Debt in the approximate amount of $217 million. Host also received a similar proposal from Nomura at about that time." (Amended Complaint, ¶ 76.) Plaintiffs also allege that the Solicitation was false due to the Defendants' failure to disclose that they were considering a REIT conversion. Plaintiffs further allege that Defendants made false statements in the REIT Statement regarding the appraisal value of the Hotel. Finally, Plaintiffs allege an omission by Defendants that Defendants would receive "an additional premium of value" from the merger. [Doc. 56, p. 26].

Defendants first contend that preliminary consideration of a possible REIT conversion prior to issuing the Solicitation was not an existing material fact requiring disclosure. Defendants also contend that the REIT Statement's disclosures regarding the value of the Hotel was not misleading. Defendants contend that the Solicitation statement regarding refinancing alternatives was not false or misleading because no firm alternative to the merger existed. Finally, Defendants contend that all required disclosures were made regarding what Defendants would receive from the merger.

■ The Plaintiffs have adequately alleged a false statement with respect to the availability of alternative means of refinancing the Hotel's mortgage. In the Solicitation, the Defendants stated that the General Partner could not identify a potential lender that would provide the requested financing in the amount of $217 million. Plaintiffs allege that Defendants had two proposals to provide the necessary financing. This is sufficient to satisfy Rule 9(b) and the Reform Act. Defendants admit to having the proposal from Goldman, Sachs before the Solicitation was issued. On its face, the Goldman Sachs proposal appears to be exactly what the Defendants denied having. Defendants point out that Plaintiffs have possessed the Goldman, Sachs letter since January, 1998, and have never before argued it had any significance. Furthermore, Defendants contend that the express terms of the letter show that the Solicitation was accurate. Defendants contend first that Goldman, Sachs never offered to provide $217 million in refinancing. In any event, Defendants contend $217 million would not have been adequate, as was disclosed in the Question and Answer Sheet accompanying the Solicitation. The Q & A Sheet disclosed that approximately $229 million was required to refinance the Hotel's mortgage debt and pay for necessary capital repairs. Addi-

tionally, the Solicitation discloses that an additional $19.6 million was needed for capital expenditures and renovations in addition to the mortgage debt. These arguments may have some validity, but they require the Court to go beyond the pleadings and materials subject to judicial notice or the incorporation by reference doctrine. The issue may be revisited at the summary judgment stage.

■ With regard to the failure to disclose consideration of the REIT conversion, Plaintiffs allege in the Amended Complaint that Defendants failed to disclose that, "at the time the Solicitation was issued, Host was already planning the REIT Merger." [Doc. 52, ¶ 78]. Plaintiffs allege that Host explored a REIT conversion as early as December, 1996, and internally explored the reorganization of Host as a REIT during the fourth quarter of 1997. Thus, Plaintiffs allege that Defendants failed to disclose that Plaintiffs had the opportunity to refinance without forfeiting most of their equity to Host, and also failed to disclose that the "imminent" REIT conversion made the infusion of equity from Host irrelevant. [Doc. 52, ¶ 79]. The Court finds that Plaintiffs have sufficiently alleged an omission by Defendants with respect to the failure to disclose considerations of a REIT Merger. Plaintiffs' allegation of an omission of REIT Merger considerations satisfies the particularity requirements of Rule 9(b), and also specifies the statements alleged to have been misleading and the reason why the statements were misleading as required by the Reform Act.

■ Turning to the alleged false statements in the REIT Statement regarding the appraisal value of the Hotel, Plaintiffs contend Defendants failed to disclose an appraisal by Arthur Consulting that valued the Hotel at approximately $20 million more than the AAA appraisal utilized in the REIT Statement. Therefore, they contend that the $255 million appraised value in the Reit Statement is false. This identifies the alleged false statement with sufficient particularity to comply with Rule

9(b) and the Reform Act. The appraised value stated in the REIT Statement is arguably false when laid beside what the Plaintiffs allege that the Defendants concealed. Defendants argue that there is no difference between the AAA and Arthur appraisals. This appears to be correct, but the Plaintiffs are entitled to the benefit of the doubt.

Finally, Plaintiffs allege that Defendants failed to disclose that Defendants would receive "an additional premium of value" from the merger. Plaintiffs allege that Defendants omitted disclosing that they would acquire the Hotel and the "resultant strengthening of its balance sheet and increased attractiveness to the investing public." [Doc. 56, p. 26]. Because Host was the parent company of the partnership's General Partner, Plaintiffs contend that Host owed a fiduciary duty to them. Plaintiffs argue this duty required disclosure in the Solicitation of what Plaintiffs describe as a "windfall."

■ Omissions are actionable only when the defendant had a duty to disclose. *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986). To determine whether Defendants had a duty to disclose, the Court considers the relationship between the parties, access to the information to be disclosed, the benefit derived by the defendant, defendant's awareness of plaintiff's reliance on defendant in making the investment decision, and defendant's role in initiating the purchase or sale. *Id.* at 1043. Considering these factors, the Court finds no duty by Defendants to disclose the rather amorphous and subjective disclosures that are the subject of this allegation. Contrary to Plaintiffs' assertions, Defendants did not have exclusive access to information regarding the true value of the Hotel. The Solicitation disclosed the value and debt of the Hotel, the repairs necessary, and the amount of money needed to satisfy all three. That Host might reap some benefit in its stock price after refinancing a heavily mortgaged hotel needing millions of dol-

lars in improvements is an obvious possibility which Defendants had no duty to spell out. There is no statement in the REIT Statement that is false when laid side by side with what Plaintiffs allege that the Defendants concealed. Thus, under the Reform Act's elevated pleading standards, Plaintiffs' claim that Defendants failed to disclose their benefits from the merger should be dismissed.

### 4. MATERIALITY

Materially misleading statements or omissions by a defendant constitute the primary element of a Rule 10b–5 violation. *Basic, Inc. v. Levinson*, 485 U.S. 224, 246–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). A false statement or omission will be considered "material" if its disclosure would alter the total mix of facts available to an investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision. *Id.* Materiality is a mixed question of law and fact. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2nd Cir.1985). A complaint may not be dismissed under Rule 12(b)(6) unless the alleged misstatements and omissions are "so obviously unimportant to a reasonable investor that reasonable minds could differ on the question of their importance." *Id.*

As discussed above, Plaintiffs have adequately pled three false statements or actionable omissions. First, with respect to the availability of alternative means of refinancing the mortgage, there is a substantial likelihood that a reasonable shareholder would consider this important to the decision to approve the limited partnership merger. There is no question that the limited partners were in a more disadvantageous position after the approval and consummation of the merger. The existence of a practical alternative to the merger was probably the most important issue to be considered. Therefore, this alleged misrepresentation was material.

The second false statement or actionable omission is more problematical. Plaintiffs allege that Defendants' omission of its consideration of a REIT conversion in the Solicitation constitutes an actionable omission. Taking Plaintiffs' allegations as true, Defendants' preliminary consideration of a possible REIT conversion prior to the issuance of the Solicitation was not an existing material fact. Plaintiffs contend that Defendants should have disclosed that, "at the time the Consent Solicitation was issued, Host was already planning the REIT merger." [Doc. 52, ¶ 78] (emphasis deleted). Plaintiffs, however, do not allege that-at the time the Consent Solicitation became effective-the possibility of a REIT had progressed beyond preliminary considerations. Indeed, the documents upon which Plaintiffs rely reveal that Host's internal consideration of a potential REIT reorganization prior to the Consent Solicitation was preliminary, contingent and speculative.

Consideration of a corporate change, such as a merger, is only material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (internal quotes omitted). However,

[t]he more tentative the discussions the less useful such information will be to a reasonable investor in reaching a decision. Information of speculative and tentative discussions is of dubious and marginal significance to that decision. To hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to 'bury the shareholders in an avalanche of trivial information'; the very perils that the limit on disclosure imposed by the materiality requirement serves to avoid.

*Panfil v. ACC Corp.*, 768 F.Supp. 54, 58 (W.D.N.Y.1991) (citations omitted), *aff'd*, 952 F.2d 394 (2d Cir.1991). Thus, where a complaint's allegations fail to allege plans

beyond mere preliminary consideration, the "allegations on the issue of materiality, . . . are insufficient as a matter of law." *Berkowitz v. Conrail, Inc.*, 1997 WL 611606, *11 (E.D.Pa.). Because Plaintiffs do not allege that anything beyond preliminary internal consideration occurred, their allegations fail to state a claim. The law is clear that an internal exploration of a potential business restructuring does not rise to the level of materiality required to state a claim for securities fraud. *Panfil*, 768 F.Supp. at 58–59 (plaintiff claimed that at the time he sold stock to corporate insiders, they knew but did not disclose that the corporation intended to pursue a potential merger; on the defendants' motion to dismiss, the court held that the "mere 'intention' to pursue a possible merger at some time in the future, without more, is simply not a material fact under rule 10b–5" and such omissions were "not material as a matter of law").

■ In a related argument, Plaintiffs also contend that there was no need for the Limited Partners to give up 60% of their equity to the Defendants. Instead, Plaintiffs argue all that was needed was a short-term bridge loan to the REIT conversion, which would have enabled the Limited Partners to retain their full ownership interests in the Hotel up to the time of the REIT conversion. The crux of this argument is Plaintiffs' dissatisfaction with Defendants' management decisions. Despite Plaintiffs' attempts to allege a material misrepresentation, their arguments rely on the disputed fairness of a merger to which they overwhelmingly approved with full disclosure of all material facts. After the fact, Plaintiffs now attempt to attack the merger because of the subsequent REIT conversion. The "central thrust" of their argument, however, is Plaintiffs' belief that the Original Limited Partnership should not have been restructured. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir.1981) (stating that when the "central thrust" of a claim arises from acts of corporate mismanagement, such claims are not cognizable under federal securities laws). Conse-

quently, the Amended Complaint fails to state a claim for securities fraud based on the nondisclosure of the preliminary REIT consideration.

■ Finally with respect to the valuation issue, the alleged misrepresentation is not material. The difference in appraised value is obtained only by disregarding the offset of $20 million for deferred maintenance. Plaintiffs have failed to show that there is a substantial likelihood that a reasonable investor would have thought that the difference in appraised value was important to the decision to approve the REIT conversion. The significance of the appraised value of the Hotel was in calculating the Estimated Exchange Value for each limited partnership unit. Plaintiffs allege that a difference of $20 million in appraised value for the property as a whole would increase the unit conversion value to approximately $79,000. Initially, the Court was completely baffled by this allegation. After careful study of the REIT Statement, it appears that Plaintiffs base this allegation upon dividing $20 million by 530 (the number of original Class A partnership units) and adding this to the $41,570 per partnership unit of Estimated Adjusted Appraised Values. To perform this calculation, the hypothetical reasonable investor would have to know that any increase in aggregate value would go entirely to the limited partners (which may or may not be true) based upon a detailed legal analysis of the limited partnership agreement. The hypothetical reasonable investor who carefully studied the REIT statement would think that an increase in Estimated Exchange Value for each limited partnership unit would result in his or her acquisition of *more* OP Units and common shares of the REIT, making the REIT conversion look like a better deal for the limited partners. With an Estimated Exchange Value of $79,000 per partnership unit, each partner would receive a minimum of 5,097 OP Units.

Knowing all of this, the hypothetical reasonable investor would also know that the

number of OP Units issued could fluctuate as much as 50 % depending upon the price of Host REIT common stock for 20 days prior to the conversion. With an Estimated Exchange Value of $45,425, as calculated by the Defendants, and a REIT stock price of $9.50, each partner would receive 4,781 OP Units. In other words, the hypothetical reasonable investor would understand that the value he or she received from the REIT conversion depended upon a number of variables, only one of which was the appraised value of the Hotel. Plaintiffs may legitimately complain that they did not receive the OP Units or REIT shares that they should have received. They cannot claim that the REIT Statement was false and misleading in stating the formula for calculating the number of OP Units and REIT shares that they would receive. Therefore, the Court concludes that this alleged misrepresentation was not material.

### 5. SCIENTER

■ Finally, Plaintiffs must properly allege scienter in order to state a claim pursuant to Section 10(b) and Rule 10(b)(5). The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Before the enactment of the Reform Act, the law in the Eleventh Circuit was clear that "a showing of 'severe recklessness' satisfies the scienter requirement." *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989).

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* (*quoting Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961 (5th Cir.1981) (*en banc*), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)). The Eleventh Circuit in *Bryant* reaffirmed this standard for establishing scienter after the Reform Act. *Bryant,* 187 F.3d at 1284–85. In the Eleventh Circuit, prior to the Reform Act, there was no special pleading standard for securities fraud actions. The Reform Act, however, now provides that, as to each statement or omission, plaintiffs must set forth particular facts that give rise to a strong inference that the defendants acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2).

The only material false statement that is pled with sufficient particularity to satisfy Rule 9(b) and the Reform Act is the statement in the Solicitation that alternative sources of refinancing had been explored but were unavailable. Plaintiffs have alleged an abundance of facts establishing that the limited partnership merger benefitted the Defendants to the detriment of the Plaintiffs. Thus, the Defendants had a motive to deceive. This, alone, is not enough to establish scienter. *Bryant,* 187 F.3d at 1284–85. In addition to motivation, it is clear that the unavailability of alternate financing was the critical fact that Defendants used to justify such a drastic and unfavorable restructuring of the interests of the limited partners in the Hotel. If, in fact, Defendants had two lenders standing by, ready to refinance the Hotel mortgage, this is sufficient to give rise to a strong inference that the alleged misrepresentation was made with the intent to deceive. In the words of the Eleventh Circuit, such a misrepresentation would be "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *McDonald,* 863 F.2d at 814; *Bryant,* 187 F.3d at 1282, n. 18. If the Plaintiffs alleged that the Defendants made an inadequate attempt to locate other lenders, that would be insufficient to draw the strong inference of an intent to deceive; an inference of negligence could be drawn as easily as an infer-

ence of an intent to deceive. The facts alleged (which still must be proven to be true) are much stronger than that. It is alleged that there were two lenders available to refinance the Hotel mortgage, and that the Defendants not only concealed this but affirmatively lied about it in the Solicitation. · If the Defendants lied about the unavailability of alternative financing, the only reasonable inference that can be drawn is that there was an intention to deceive. Scienter is adequately pled to allow the Plaintiffs' Section 10(b) claims to go forward as to this alleged misrepresentation.

■ In order to more fully explain this conclusion, a word may be in order regarding the Plaintiffs' allegations that the Defendants are guilty of securities fraud in failing to disclose the fact that they considered conversion of their hotel properties into a REIT at about the time that they proposed the Limited Partnership merger. If this was a material fact, Plaintiffs have not alleged facts sufficient to establish scienter. Given the facts alleged in the Amended Complaint, no strong inference of an intent to deceive arises due to the omission of this fact from the Solicitation. It is undisputed that only preliminary consideration was given to this alternative at that time. The Court could easily draw the inference that this was not disclosed because the Defendants did not consider this to be a realistic alternative to the proposed merger of the limited partnerships, and that they would be misleading the limited partners by suggesting that it was. This alleged omission did not relate to the critical justification for the drastic restructuring of the interests of the Limited Partners. Similarly, there is no strong inference of scienter with respect to the alleged failure to disclose a higher appraisal of the value of the Hotel. The Court could easily draw the inference that this was not disclosed because the Defendants thought that it would be misleading to rely upon an appraised value that did not take into consideration the offset for deferred maintenance. In contrast, in the Court's view, scienter is established with respect

to the alleged misrepresentation regarding the unavailability of alternative financing because no reasonable inference can be drawn other than an intent to deceive if the facts as alleged are proven to be true.

## B. *RULE 14 "ANTI–BUNDLING" REGULATIONS*

■ In Count II, Plaintiffs claim that Defendants violated the "anti-bundling" regulations of SEC Rules 14a–4(a)(3) and 14a–4(b)(1). [Doc. 52, ¶ 89, ¶¶ 98–100]. These regulations require that the security holder be provided an opportunity to approve or disapprove each separate matter to be acted upon. Plaintiffs allege Defendants violated the anti-bundling rules in their presentation of the issues of the REIT conversion and the proposed amendment to the Partnership Agreement. Plaintiffs contend that there is a private right to bring claims arising from the violation of these regulations. *See Koppel v. 4987 Corp.*, 167 F.3d 125 (2nd Cir.1999). Defendants contend that no private right of action exists under the anti-bundling regulations. They also contend the REIT Statement complied with the anti-bundling regulations.

Assuming without deciding that a private right of action exists for violations of the anti-bundling regulations, Defendants have complied with the regulations. In pertinent part, the regulations provide:

(a) The form of proxy... (3) Shall identify clearly and impartially each separate matter intended to be acted upon, whether or not related to or conditioned on the approval of other matters, and whether proposed by the registrant or by security holders... (b)(1) Means shall be provided in the form of proxy whereby the person solicited is afforded an opportunity to specify by boxes a choice between approval or disapproval of, or abstention with respect to each separate matter referred to therein as intended to be acted upon, other than elections to office.

17 C.F.R. § 240.14a–4(1999). Plaintiffs argue that because the vote on the amendments to the Partnership Agreement and the vote on the REIT conversion were presented in the same document, the Limited Partners did not have the opportunity to consider the two issues separately. The regulations, however, do not require that every item be subjected to separate and individual solicitations. The regulations merely require that proxies identify each separate matter to be voted upon and afford the persons solicited an opportunity to approve, disapprove or abstain with respect to each separate matter. 17 C.F.R. § 240.14a–4(a)(3) and § 240.14a–4(a)(3)(b)(1) (1999). The REIT Statement satisfied those two requirements by identifying the REIT Merger and the amendments to the Partnership Agreement as separate issues and by allowing the Limited Partners to vote on each issue independently. Each Limited Partner was permitted to vote "FOR", "AGAINST," or "ABSTAIN" as to the REIT conversion, and separately to vote "FOR," "AGAINST," or "ABSTAIN" as to the amendments to the Partnership Agreement. [Doc. 54, Exh. A, p. 30]. In their response to the Motion to Dismiss, Plaintiffs do not contend that they are making a Section 14 claim apart from the alleged violations of the anti-bundling regulations. Accordingly, the Motion to Dismiss should be granted as to Count II of Plaintiffs' Amended Complaint.

### C. *SECTION 20 CLAIMS*

In Count III, Plaintiffs allege Defendants Host Marriott and Mr. Townsend violated Section 20(a) of the Exchange Act. Plaintiffs allege these Defendants are liable as "control persons" of the New Limited Partnership by their positions and control over the General Partner. [Doc. 52, ¶¶ 102–104]. In view of the Court's ruling with respect to Counts I and II, the Motion to Dismiss is denied with respect to Count I and granted with respect to Count II.

### D. *BREACH OF FIDUCIARY DUTY*

In Count IV, Plaintiffs allege a breach of fiduciary duty by Defendants in structuring the limited partnership merger and REIT conversion in a manner unfair to the limited partners. Plaintiffs contend their claim is a direct claim rather than a derivative one. [Doc. 56, p. 29]. They contend that they have standing whether the claim is viewed as a direct or a derivative claim. As noted in the Court's previous Order, this state law claim is not subject to Rule 9(b) or the Reform Act. Furthermore, and despite Defendants' pleas to the contrary, the Court finds no compelling reason to abstain from exercising jurisdiction over this claim. *See Metropolitan Life v. Lockette,* 155 F.3d 1339, 1341 (11th Cir.1998) (holding that "[a]bstention from the exercise of federal jurisdiction is the exception not the rule."). Thus, fulfilling its obligation to adjudicate cases properly before it, the Court will exercise jurisdiction over this case, including Plaintiffs' state law claims for breach of fiduciary duty and breach of the Partnership Agreement.

Defendants contend that Plaintiffs lack standing to assert a derivative claim on behalf of the New Limited Partnership because they are no longer Limited Partners. As a general rule of Delaware law,[3] "a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at time of commencement of suit but...must also maintain shareholder status throughout the litigation." *Lewis v. Anderson,* 477 A.2d 1040, 1046 (Del.1984). Plaintiffs contend that, to the extent their claims are derivative, they have standing under an exception to the general rule "where the merger itself is the subject of a claim of fraud." *Id.* at 1046, n. 10. The Delaware Supreme Court explained that this exception applies when "the merger was perpetrated to deprive [the corporation on whose behalf the suit is brought] of its claim against the individual defendants." *Id.* at 1046, n. 10. That is

---

**3.** Delaware law applies to this action regarding a partnership organized in Delaware

against Host Marriott Corporation, a Delaware corporation.

not the case here. Plaintiffs' Amended Complaint does not allege that Defendants perpetrated the merger to deprive the Limited Partners of derivative claims arising from a separate alleged breach of fiduciary duty. Rather, it is the merger itself that Plaintiffs allege to be a breach of fiduciary duty. Plaintiffs allege that Defendants "breached their fiduciary duties to the Limited Partners and the Partnership *by structuring a Merger and REIT Merger* in a manner and with terms unfair to the Limited Partners..." [Doc. 52, ¶ 107] (emphasis added). Thus, Plaintiffs cannot avail themselves of the exception to the general rule that a derivative shareholder must maintain shareholder status throughout the litigation. Accordingly, Plaintiffs lack standing to assert any derivative claims on behalf of the New Limited Partnership. In addition, the derivative claim has not been pled in conformity with Rule 23.1.

 Alternatively, Plaintiffs contend that their claims for breach of fiduciary duty are direct, or individual claims. In deciding whether a complaint states an individual or a derivative claim, the Court is not bound by the designation chosen by the plaintiff. *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1069 (Del.Ch.1985), *aff'd*, 500 A.2d 1346 (Del.1985). Instead, the nature of the action is judged by the body of the complaint. *Id.* "To set out an individual action, the plaintiff must allege either an injury which is separate and distinct from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists independently of any right of the corporation." *Id.* at 1070 (internal quotes and citations omitted). "Where a shareholder's complaint sets out a cause of action that is both individual and derivative, the shareholder may proceed with the individual action." *Id.* Plaintiffs' claim, fairly read, seeks to recover for an alleged loss in value to their partnership interests, which is both a derivative claim and a direct or individual claim. Plaintiffs claim that they were deprived of their contractu-

al equity interests in the Hotel by Defendants' breach of their fiduciary duties. The injury is not only to the Limited Partnership, but to the Limited Partners. This is sufficient to state a claim for an individual claim for breach of fiduciary duty. It is not a pure derivative claim. *See Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898, 906 ( 11th Cir.1998). Accordingly, the Motion to Dismiss should be denied as to Count IV.

E. *BREACH OF THE PARTNERSHIP AGREEMENT*

Finally, in Count V, Plaintiffs allege Defendants breached the Partnership Agreement. Although Defendants have moved the Court to dismiss Plaintiffs' Amended Complaint in its entirety, Defendants have presented no argument on the merits of Plaintiffs' claim for breach of the Partnership Agreement. Defendants only argue that the Court should exercise its discretion and dismiss Plaintiffs' state law claims. As noted above, the Court finds no compelling reason to shirk its obligation to adjudicate cases properly before it, and will exercise jurisdiction over Plaintiffs' state law claims. Accordingly, the Court finds that Plaintiffs have stated a claim upon which relief could be granted in Count V for breach of the Partnership Agreement. The Motion to Dismiss should be denied as to this claim. The Court will sort out later the issue of whether Counts IV and V actually state separate claims for relief.

IV. *CONCLUSION*

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Complaint [Doc. 54] is GRANTED IN PART AND DENIED IN PART as to Count I, GRANTED as to Count II, GRANTED IN PART AND DENIED IN PART as to Count III, and DENIED as to Counts IV and V.